IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RUSSELL TINSLEY | : | CIVIL ACTION |
| | : | NO. 05-2777 |
| V. | : | |
| | : | |
| LOUIS GIORLA, et al. | : | |

O'NEILL, J.                                                        APRIL 1, 2008

MEMORANDUM

On August 9, 2005 plaintiff Russell Tinsley filed a complaint alleging that he was "being denied access to the courts" against defendants Louis Giorla, Warden of Curran Fromhold Correctional Facility ("CFCF"); Osie Butler, Deputy Warden of CFCF; CFCF Officer North; CFCF Officer Wheeler; and a social worker at CFCF identified as "Mr. Henson."  After counsel was appointed to represent him, plaintiff filed an amended complaint on July 7, 2006 against previously named defendants Giorla, Butler, North, and Wheeler;[1] Leon A. King, Commissioner of Prisons in Philadelphia; Rodney Brockenbrough, a prison official at Philadelphia Industrial Correctional Center ("PICC"); PICC Sergeant Cuffee; PICC Lieutenant Knight; and PICC Lieutenant Spellman.  Plaintiff's amended complaint alleges the following claims under 42 U.S.C. § 1983: inadequate access to the prison legal library in violation of the Fourteenth Amendment (Count I); denial of legal correspondence in violation of the First Amendment (Count II); seizure of legal papers in violation of the Fourth Amendment (Count III); retaliation in violation of the First and Fourteenth Amendments (Count IV); and cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments (Count V).

---

[1] Plaintiff did not name original defendant Henson as a defendant in his amended complaint.

Plaintiff filed a motion for a temporary restraining order and preliminary injunction on August 16, 2006.  The Honorable R. Barclay Surrick held a hearing on plaintiff's motion on August 17, 2006 and denied plaintiff's motion in a memorandum and Order dated August 22, 2006.[2]

Presently before me are defendants' motion for summary judgment, plaintiff's response, and defendants' reply.

BACKGROUND

At all times relevant to this action plaintiff Russell Tinsley, a citizen of the United States, was incarcerated at CFCF, located at 7901 State Road, Philadelphia, Pennsylvania, or PICC, located at 8301 State Road, Philadelphia, Pennsylvania.  Plaintiff was received into custody at CFCF on or about March 9, 2005.  On June 16, 2005 plaintiff was transferred to PICC, where remained incarcerated until February 24, 2006, when he was transferred back to CFCF.

Upon admission to the Philadelphia Prison System inmates receive a Philadelphia Prisons Policies and Procedures Handbook which provides information regarding inmates' rights and responsibilities and inmate grievance procedures.  Plaintiff stated in a sworn declaration dated August 4, 2006 that he received this Handbook at the time of his incarceration.  He attached to his Declaration as Exhibit "A" a copy of Section 3.F.7 of the Philadelphia Prisons Policies and Procedures – according to plaintiff, "the relevant portions of the Handbook" – which discusses the subject of inmate law libraries.  Plaintiff further testified that he reviewed the Handbook while a trainee at the PICC law library between November 2005 and February 2006.

_____

[2]My colleague, Judge Surrick, was acting as emergency judge during my absence from the courthouse.

I.      Plaintiff's Access to Law Libraries

With respect to inmates' rights to reasonable access to law libraries the Philadelphia

Prisons Policies and Procedures specifically provide, "The inmate population will have

reasonable access to the law library within the hours that the law libraries are required to be open.

A scheduling system will be developed and implemented by each facility that will ensure fair

access to the law library by the inmates." CFCF and PICC have established systems whereby

inmates of a particular housing unit are allowed access to the law libraries. Each housing unit is

assigned approximately an hour and a half per day, approximately two days per week. An inmate

is required to sign up for his unit's assigned time, and access is granted on a first-come, first-

serve basis. An inmate is permitted to request additional time in the law library by submitting a

"request to staff" for approval. Any denied request to staff must be justified and logged. The

law libraries are not open during regular hours only in the event of a lock down – a major

disturbance in the facilities – or during count time – approximately 5:30 p.m. to 6:00 p.m.

Plaintiff was granted access to the law libraries while incarcerated at CFCF from March

2005 to June 2005 and at PICC from June 2005 to November 2005. Plaintiff testified, "I got to

go to the law library, but not every day . . . ." Though the record indicates that plaintiff signed

into the law library fifty-two times from late March 2005 through November 2005, plaintiff

alleges that defendants denied him access on numerous occasions, even when he had signed in.

Consequently, the specific number of times plaintiff was granted access to the law library is

unclear from the record. Plaintiff testified, "I can't give you an actual calculation of how much

time I have per week because some weeks I didn't even get into the law library. Some days I

didn't get into the law library, whether I signed up or not." He added, "I don't recall the exact

number, but I know it wasn't enough."  Plaintiff further testified, "What I believe would have

been adequate access, to give me anywhere from 15 to 20 hours per week.  I would have been

satisfied with that."

In November 2005 plaintiff was hired as a law library trainee at PICC.  In that position

plaintiff was assigned to the law library five days per week for approximately five hours per day.

Plaintiff alleges that during this time he usually was assisting others and was not working on his

own case; however, defendant Spellman fired plaintiff in February 2006 because he was not

helping other inmates with their cases and was failing to perform his duties in the law library.

One week after he was fired as a law library trainee at PICC, plaintiff was transferred back to

CFCF.

On March 16, 2006 plaintiff's law library and legal mailing privileges were revoked

pursuant to an Order entered by the Court of Common Pleas of Philadelphia County.  On August

31, 2006 the Court vacated its March 16 Order and reinstated plaintiff's law library and legal

mailing privileges.  Plaintiff alleges that after the reinstatement of his privileges plaintiff

"continues to be denied all but minimal, infrequent and severely curtailed access to the law

library at CFCF despite diligently signing up for Assigned Unit Time and requesting additional

time through requests to staff."

II.       Plaintiff's Filing of Grievances

With respect to inmate grievance procedures the Philadelphia Prisons Policies and

Procedures provide that inmates may file grievances regarding a policy application within a PPS

facility, a condition within a PPS facility, an action involving an inmate at a PPS facility, or an

incident occurring within a PPS facility.  A grievance may be initiated for a number of reasons,

including "an alleged violation of an inmate's civil, constitutional, or statutory rights.  The Philadelphia Prisons Policies and Procedures expressly state, "Use of, or participation in, the grievance procedure will not result in any form of reprisal, and an inmate shall be entitled to pursue, through the grievance procedure, a complaint that a reprisal occurred."

The Policies and Procedures provide that the Warden of each PPS facility is responsible for the proper administration of the grievance procedure and that the Deputy Warden for Administration is responsible for daily implementation, record keeping, and oversight.  The Policies and Procedures expressly state, "The grievant shall have a right of appeal at every level of authority, until a grievance reaches the Commissioner of the PPS, whose decision is final." Inmate grievances are placed in "grievance boxes" located within the housing units of PPS facilities.  The grievances are to be delivered to the Deputy Warden for Administration every weekday by 12:00 p.m.  On weekends, the grievances are to be delivered to the shift commander, who will review them for emergencies and deliver them to the Deputy Warden by 12:00 p.m. on Monday.

The Deputy Warden is to review the grievance and make one of three decisions: 1) reject the grievance and return it to the inmate with a notation explaining the return within fourteen days if it concerns a non-grievable issue, is frivolous on its face, or is otherwise inconsistent with procedures; 2) attempt to resolve the grievance him/herself and log the grievance as resolved; or 3) distribute the grievance to an appropriate staff member who then must return the grievance form to the Deputy Warden with a proposed resolution or explanation for inability for resolution within thirty days.  If the Deputy Warden chooses option three, he/she will forward a Finding of Inmate Grievance form noting the recommended action to the Warden for review.  The Warden

5

will review the Deputy Warden's recommended action and approve, deny, or modify it within fourteen days, note his/her decision on the Finding of Inmate Grievance Form, and forward signed copies to the inmate.  If unsatisfied with the Warden's decision, the inmate has five days to appeal to the Commissioner for review.

The above-stated inmate grievance procedures are set forth in the Philadelphia Prisons Policies and Procedures and also are provided to inmates in the Inmate Handbook plaintiff received at the time of his incarceration and reviewed while a trainee at the PICC law library.

Between March 25, 2005 and December 4, 2006 plaintiff filed at least fifteen grievances with prison officials at either CFCF or PICC.  Plaintiff asserts that the majority of these grievances related to denial of access to the law library or retaliatory conduct by correctional officers.  PPS records of inmate grievances note six grievances filed by plaintiff, all submitted at CFCF and marked as resolved.  The record in this action includes four Inmate Grievance Forms – filed on June 30, 2005; September 9, 2006; September 20, 2006; and October 31, 2006 – not recorded by the PPS records of inmate grievances, i.e., not among the six grievances marked as resolved.

Before filing the present action plaintiff never had appealed any denial of his grievances. Though he acknowledges receipt and review of the Inmate Handbook, plaintiff alleges that the grievance procedure was not explained during his orientation or at anytime thereafter.  Plaintiff further alleges that defendant Butler "didn't give me any impression that I had to file an additional appeal on her findings, you know.  She said once she get a decision from the warden, that's a final decision."  Plaintiff therefore alleges that prior to the filing of this action he did not know appeal was an option in the inmate grievance procedure.

6

III.    Plaintiff's Allegations of Retaliatory Acts

Plaintiff's amended complaint alleges that defendants engaged in at least six specific instances of retaliation "designed to: (1) obstruct [plaintiff] from obtaining access to the law library to prepare his defense in his Criminal Action; (2) unlawfully confiscate his property; and (3) prevent him from seeking redress for being denied access to the law library, but also, further generalized attempts by the Defendants to subject [plaintiff] to a hostile and unsafe living environment, and to subject him to threats to his well-being."  Plaintiff alleges that defendants engaged in these actions "[a]s a result to [plaintiff's] numerous attempts to exercise his right to access the law library, and his expression of dissatisfaction with the ongoing denial of his rights" both verbally and through the filing of grievances.

Plaintiff notes in his brief that "four acts of retaliation in particular stand out as acts that have clearly violated [plaintiff's] constitutional rights": 1) after plaintiff filed grievances against CFCF officers and this lawsuit, he was transferred from CFCF to PICC as punishment; 2) for his alleged misconduct after being denied access to the PICC law library on June 27, 2005, plaintiff was placed in administrative segregation for twelve days and his legal materials were confiscated; 3) after plaintiff filed a grievance against defendant Knight for mistreating him as a law library trainee, defendant Knight allegedly threatened to have plaintiff placed in administrative segregation, harmed by other inmates, and killed; and 4) after plaintiff questioned defendant Wheeler about why she refused to hire him at the CFCF law library, defendant Wheeler allegedly threatened plaintiff and insinuated that she would kill him.

## STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides, in relevant part, that

summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue of material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Summary judgment will be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The party moving for summary judgment has the burden of demonstrating that there are no genuine issues of material fact. Id. at 322-23. If the moving party sustains the burden, the nonmoving party must set forth facts demonstrating the existence of a genuine issue for trial. See Anderson, 477 U.S. at 255. Rule 56(e) provides that when a properly supported motion for summary judgment is made, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The adverse party therefore must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion, and cannot survive by relying on unsupported assertions, conclusory allegations, or mere suspicions. Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989). However, the "existence of disputed issues of material fact should be ascertained by resolving 'all inferences, doubts and issues of credibility against'" the moving party. Ely v. Hall's Motor Transit Co., 590 F.2d 62, 66 (3d Cir. 1978), quoting Smith v. Pittsburgh Gage & Supply Co., 464 F.2d 870, 878 (3d Cir. 1972).

DISCUSSION

I.    Failure to Exhaust Administrative Remedies

As a threshold issue defendants contend that plaintiff's present claim is barred for failure to exhaust his administrative remedies.  The Prison Litigation Reform Act provides, in relevant part: "No action shall be brought with respect to prison conditions . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).  The Court of Appeals consistently has held that "an inmate seeking relief that the prison's administrative grievance system cannot provide . . . must nonetheless pursue the grievance process to its end before coming to federal court. [The Court of Appeals] concluded that the PLRA 'make[s] exhaustion of *all* administrative remedies mandatory.'"  Spruill v. Gillis, 372 F.3d 218, 227 (3d Cir. 2004), quoting Nyhuis v. Reno, 204 F.3d 65, 67 (3d Cir. 2000) (emphasis in original).  However the Court of Appeals has made an exception to the exhaustion requirement where an inmate demonstrates that he lacked "available" administrative remedies.  See Mitchell v. Horn, 318 F.3d 523, 529 (3d Cir. 2003) (finding that an inmate lacked "available" administrative remedies where prison officials denied him necessary grievance forms).

In the present motion defendants argue that plaintiff's § 1983 claim is barred because plaintiff never has filed an appeal pursuant to the inmate grievance procedures at CFCF and PICC and therefore has failed to exhaust his administrative remedies.  Though plaintiff admits that he was provided and subsequently reviewed a Philadelphia Prisons Policies and Procedures Handbook outlining the inmate grievance procedures, plaintiff alleges that defendant Butler expressly informed him that the initial decision by the warden is a final decision, i.e., no appeals

9

process existed.  I conclude that such a statement if accepted by the fact-finder as having been

made is a sufficient basis for the fact-finder to determine that plaintiff lacked "available"

administrative remedies.

II.      Plaintiff's Section 1983 Claims

Section 1983 provides an avenue for individuals to adjudicate violations of rights secured

under federal constitutional or statutory law.  Elmore v. Cleary, 399 F.3d 279, 281 (3d Cir.

2005).  A valid claim under § 1983 must plead adequately three elements: (1) defendants acted

under color of law; (2) defendants violated plaintiffs' federal constitutional or statutory rights;

and (3) that violation caused injury to plaintiffs.  Id.  In the present motion defendants argue that

they are entitled to summary judgment on all five counts of plaintiff's amended complaint.  I will

discuss each count in turn.

A.      Count I: Inadequate Access to the Prison Legal Library in Violation of the Fourteenth
        Amendment

Count I of plaintiff's amended complaint alleges that defendants violated his right to

meaningful access to the courts under the Fourteenth Amendment "by restricting and denying

[plaintiff] access to the law library."  In asserting this claim plaintiff relies on Bounds v. Smith,

where the United States Supreme Court held that "the fundamental constitutional right of access

to the courts requires prison authorities to assist inmates in the preparation and filing of

meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance

from persons trained in the law."  430 U.S. 817, 828 (1977).

Subsequent to its holding in Bounds the Supreme Court has asserted, "The right that

Bounds acknowledged was the (already well-established) right of *access to the courts*. . . .

<u>Bounds</u> did not create an abstract, freestanding right to a law library or legal assistance . . . ." <u>Lewis v. Casey</u>, 518 U.S. 343, 350 (1996), <u>citing</u> <u>Bounds</u>, 430 U.S. at 817, 821, 828 (emphasis in the original).  "Insofar as the right vindicated by <u>Bounds</u> is concerned, 'meaningful access to the courts is the touchstone,' and the inmate therefore must go one step further and demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim.  <u>Casey</u>, 518 U.S. at 351, <u>quoting</u> <u>Bounds</u>, 430 U.S. at 823 ("He might show, for example, that a complaint he prepared was dismissed for failure to satisfy some technical requirement which, because of deficiencies in the prison's legal assistance facilities, he could not have known.  Or that he had suffered arguably actionable harm that he wished to bring before the courts, but was so stymied by inadequacies of the law library that he was unable even to file a complaint.").  The Court reasoned, "Although <u>Bounds</u> itself made no mention of an actual-injury requirement, it can hardly be thought to have eliminated that constitutional prerequisite.  And actual injury is apparent on the face of almost all the opinions in the 35-year line of access-to-courts cases on which <u>Bounds</u> relied."  <u>Casey</u>, 518 U.S. at 351-52, <u>citing</u> <u>Bounds</u>, 430 U.S. at 821-25.

The Court also noted in <u>Casey</u> that the dissent's suggestion of waiving this actual-injury requirement in cases involving substantial, systemic deprivation of access to court – i.e., in cases involving a direct, substantial and continuous limit on legal materials, total denial of access to a library, or an absolute deprivation of access to all legal materials – rested upon the expansive understanding of <u>Bounds</u> repudiated by the Court.  <u>Casey</u>, 518 U.S. at 353 n.4, <u>citing</u> <u>Bounds</u>, 430 U.S. at 401 n.2 (Souter, J., dissenting) ("Unless prisoners have a freestanding right to libraries, a showing of the sort Justice Souter describes would establish no relevant injury in fact,

11

i.e., injury-in-fact *caused by the violation of legal right*." (emphasis in original)).

Plaintiff alleges that defendant's failure to grant him a reasonable amount of time in the law libraries at CFCF and PICC – according to plaintiff, fifteen to twenty hours per week – constitutes a violation of his right to access to the courts. However, because there is no freestanding right to libraries, plaintiff in this case must demonstrate that the alleged limitation on his access to the law libraries hindered his efforts to pursue a legal claim, even where plaintiff's law library privileges were revoked for a period of time pursuant to a court order. In other words, plaintiff must demonstrate actual injury beyond his mere dissatisfaction over defendants' failure to grant him an absurdly high number of hours per week in the law library.

Plaintiff has failed to provide evidence that his efforts to pursue a legal claim were hindered, and thus plaintiff fails to meet the constitutional prerequisite of demonstrating actual injury. Contrary to plaintiff's contentions, the record reflects he was able fully to pursue his legal claims and exercise his right of access to the courts. First, as plaintiff admitted in his deposition, he indeed was granted access to the law library for the majority of his time at CFCF and PICC. Though the number of hours plaintiff spent in the law library is unclear, I nevertheless conclude that the law library access actually granted to plaintiff was meaningful. The record shows that access to the law libraries at CFCF and PICC enabled plaintiff to initiate two civil actions in this Court and file numerous motions in his criminal action in the Court of Common Pleas. Further plaintiff has not missed any deadlines or requested any continuances in his criminal action based on insufficient time in the law libraries. Nothing in the record shows that plaintiff suffered delay, interruption, detriment, or prejudice in any legal action, either pending or contemplated.

Plaintiff relies on the decision of the Court of Appeals in <u>Peterkin v. Jeffes</u> for the

proposition that in cases "directly involving prisoners' access to legal knowledge, an actual injury necessarily occurs by virtue of a prison's failure to provide the level of assistance required under Bounds." 855 F.2d 102, 1041-42 (3d Cir. 1988). The Court in Peterkin reasoned that "[l]egal assistance [in contrast to access to resources other than legal assistance such as the scheduling of available notary services] – whether in the form of an accessible and adequate law library, court-appointed or other attorneys or para-professionals, or some combination of legal resources – is central, not peripheral, to the right of access to the courts that Bounds protects." Id. at 1041.

Yet this distinction between "peripheral" and "central" aspects of the right to court access that formed the foundation of the holding in Peterkin subsequently has been acknowledged by the Court of Appeals as "irrelevant for purposes of the actual injury requirement" after the Supreme Court's decision in Casey. Oliver v. Fauver, 118 F.3d 175, 177 (3d Cir. 1997) ("While the Court [in Casey] did not discuss whether the adequacy of the prison library involved an 'ancillary' or 'central' aspect of the right to court access, it is clear that it found such a distinction irrelevant for purposes of the actual injury requirement."). Indeed, pursuant to the Supreme Court's decision in Casey, even the revocation of plaintiff's law library privileges between March 16, 2006 and August 31, 2006 is insufficient to waive the actual injury requirement, as the Court in Casey asserted that a total denial of access to a library or an absolute deprivation of access to all legal materials would establish no relevant injury in fact caused by the violation of a legal right.

Therefore, contrary to plaintiff's argument, I find myself bound by the assertion by the Court of Appeals in Oliver that "there is no question that after Casey, even claims involving so-called central aspects of the right to court access require a showing of actual injury. That is, the

13

inmate must 'demonstrate that the alleged shortcomings . . . hindered his efforts to pursue a legal claim." Oliver, 118 F.3d at 177-78, quoting Casey, 518 U.S. at 351.

Plaintiff also relies on the decision of the Court of Appeals in Bieregu v. Reno for the proposition that the right of access to the courts derives from the First Amendment right to petition. 59 F.3d 1445, 1452-53 (3d Cir. 1995). Plaintiff then argues that denial of meaningful access to the law library is a violation of his First Amendment rights and therefore he need not allege any consequential injury stemming from that violation, aside from the violation itself. See Jones v. Brown, 461 F.3d 353, 359 (3d Cir. 2006). In other words, plaintiff attempts to circumvent the actual injury requirement established in right to access to the courts cases like Casey by alleging that a denial of access to the law libraries constitutes a violation of his right to engage in protected communications.

However, in the aftermath of Casey the Court of Appeals has expressly distinguished the right of access to the courts implicated in the present case from the right to engage in protected communications implicated in Bieregu. The Court of Appeals stated in Jones v. Brown – a case like Bieregu involving a state pattern or practice of opening legal mail outside the presence of the addressee inmate – "Unlike the provision of legal libraries or legal services, which are not constitutional ends in themselves, but only the means for ensuring a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts, protection of an inmate's freedom to engage in protected communications is a constitutional end in itself." Jones, 461 F.3d at 359-60, quoting Casey, 518 U.S. at 351 (citation and quotation marks omitted). The Court's decision in Jones was grounded in the constitutional principle "that state prisoners, by virtue of their incarceration, 'do not forfeit their First Amendment right to use

14

of the mails' . . . and that a 'pattern or practice of opening properly marked incoming [legal] mail outside an inmate's presence infringes communication protected by the right to free speech.'" 461 F.3d at 358, <u>quoting</u> <u>Bieregu</u>, 59 F.3d at 1452.  That principle is not implicated in Count I of plaintiff's amended complaint.

For the reasons stated above I will grant defendants' motion for summary judgment with respect to Count I of plaintiff's amended complaint.

B.      <u>Count II: Denial of Legal Correspondence in Violation of the First Amendment</u>

Count II of plaintiff's amended complaint alleges that defendants violated his rights under the First Amendment by withholding legal correspondence addressed to plaintiff.  As stated above, "state prisoners, by virtue of their incarceration, do not forfeit their First Amendment right to use of the mails," and "protection of an inmate's freedom to engage in protected communications is a constitutional end in itself."  <u>Jones</u>, 461 F.3d at 358, 360 (citation omitted) (internal quotation marks omitted).  In asserting a violation of access to the courts under the First Amendment based on a denial of legal correspondence an inmate must "demonstrate that a nonfrivolous legal claim had been frustrated or was being impeded."  <u>Casey</u>, 518 U.S. at 352, <u>cited in</u> <u>Rivera v. Chesney</u>, 1998 WL 639255, at *2 (E.D. Pa. Sept. 17, 1998).  The Court of Appeals has held that a "pattern or practice of opening properly marked incoming [legal] mail outside an inmate's presence infringes communication protected by the right to free speech," <u>Jones</u>, 461 F.3d at 358 (citation omitted), i.e., that pattern or practice is sufficient to demonstrate a legal claim had been frustrated or was being impeded.

Plaintiff's amended complaint alleges that "CFCF Defendants have withheld legal correspondence addressed to [plaintiff]" but makes no allegation regarding a pattern, practice, or

15

policy infringing inmates' communication protected by the right to free speech. The record indicates that Count II of plaintiff's amended complaint is founded upon three specific instances. First plaintiff testified to "a couple of occasions" – one before March 16, 2006 and one after March 16, 2006 when the Order of the Court of Common Pleas revoking plaintiff's legal mail privileges was in effect – where plaintiff believed that legal letters addressed to him from the Department of Justice regarding tort claims were returned to sender. Plaintiff alleges that for the mailing sent before March 16, an unidentified correctional officer brought the letter to him but then stated that the letter would have to be sent back. However, plaintiff testified at his deposition that he subsequently received a copy of the legal letter from the Department of Justice previously denied to him and submitted the enclosed forms. Plaintiff also testified that at some point after August 31, 2006 the District Attorney's office did not receive an original copy of his "petitions for permission to file an interrogatory appeal to the Superior Court." However, plaintiff testified that he sent another copy after receiving a motion from the District Attorney's office requesting an extension of time.

These three instances do not constitute a pattern, practice, or policy infringing communication protected by the right to free speech case sufficient to analogize plaintiff's action to cases like Jones that implicate the right to engage in protected communications. Indeed plaintiff testified that he subsequently corrected any frustration created by the alleged instances where mail was denied. Because plaintiff has failed to demonstrate that a nonfrivolous legal claim had been frustrated or was being impeded I will grant defendants' motion for summary judgment with respect to Count II of plaintiff's amended complaint.

C.      Count III: Seizure of Legal Papers in Violation of the Fourth Amendment

Count II of plaintiff's amended complaint alleges that defendants violated his rights under the Fourth Amendment by seizing his legal papers.  The Supreme Court has held that "while persons imprisoned for crime enjoy many protections of the Constitution, it is also clear that imprisonment carries with it the circumscription or loss of many significant rights."  Hudson v. Palmer, 468 U.S. 517, 524 (1984), citing Bell v. Wolfish, 441, U.S. 520, 545 (1979).  Addressing the applicability of the Fourth Amendment in the prison context the Court reasoned in Hudson that the "right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order."  468 U.S. at 527-28.  The Court accordingly held that an inmate "does not have a reasonable expectation of privacy enabling him to invoke the protections of the Fourth Amendment."  Id. at 530.

The Court noted that this holding "does not mean that [an inmate] is without a remedy for calculated harassment unrelated to prison needs, id., and "[t]hat the Fourth Amendment does not protect against seizures in a prison cell does not mean that an inmate's property can be destroyed with impunity," id. at 528 n.8.  For example, the inmate in Hudson brought a claim that by intentionally destroying his private property a prison guard deprived him of property in violation of the Due Process Clause of the Fourteenth Amendment.  Id. at 530.  Recognizing an interest in protecting inmates from harassment the Court further held in Hudson "that an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available."  Id. at 533.  The Court reasoned that "the state's action is not complete until and unless it provides or refuses to provide a suitable

17

postdeprivation remedy." <u>Id.</u>  An inmate grievance procedure constitutes a meaningful

postdeprivation remedy.  <u>See</u> <u>id.</u> at 536 n.15.

    To the extent that plaintiff brings his claim solely pursuant to the Fourth Amendment I

find that as an incarcerated individual he did not have a reasonable expectation of privacy

enabling him to invoke the protections of the Fourth Amendment when his legal papers were

taken.[3]  Though plaintiff does not allege a violation pursuant to the Due Process Clause, I note

that if such an allegation were made the inmate grievance procedure provided by the Philadelphia

Prisons Policies and Procedures is an adequate postdeprivation remedy that would satisfy the

Court's holding in <u>Hudson</u>.

    For the reasons stated above I will grant defendants' motion for summary judgment on

Count III of plaintiff's amended complaint.

D.    <u>Count IV: Retaliation in Violation of the First and Fourteenth Amendments</u>

    Count IV of plaintiff's amended complaint alleges that defendants violated his rights

---

[3]That plaintiff in this case is a pre-trial detainee, as opposed to a convicted inmate does not alter my conclusion with respect to Count III of plaintiff's amended complaint.  The bases for limiting the Fourth Amendment's applicability to prison cells – the absence of a reasonable expectation of privacy and the presence of alternative remedies such as tort claims or an internal grievance procedure – apply equally to incarcerated pre-trial detainees.  In <u>Bell</u> the Supreme Court upheld a room search rule against a Fourth Amendment challenge by pretrial detainees, "acknowledg[ing] the plausibility of an argument that 'a person confined in a detention facility has no reasonable expectation of privacy with respect to his room or cell and that therefore the Fourth Amendment provides no protection for such a person.'"  <u>Hudson</u>, 468 U.S. at 525 n.6, <u>quoting</u> <u>Bell</u>, 441 U.S. at 556-57.  In a concurring opinion in <u>Hudson</u> Justice O'Connor noted, "When a person is arrested and incarcerated, his personal effects are routinely searched, seized, and placed in official custody. . . . The loss, theft, or destruction of property so seized has not, to my knowledge, ever been thought to state a Fourth Amendment claim.  Rather, improper inventories, defective receipts, and missing property have long been redressable in tort by actions for detinue, trespass to chattel, and conversion."  <u>Hudson</u>, 468 U.S. at 540 (O'Connor, J., concurring).

under the First and Fourteenth Amendments by retaliating against him for "exercising his right to adequate access to the law library in order to defend himself in his Criminal Action and to assert grievances regarding" denials of such access.

An inmate alleging retaliation must show: (1) constitutionally protected conduct; (2) an adverse action by prison officials sufficient to deter a person of ordinary firmness from exercising his constitutional rights; and (3) a causal link between the exercise of his constitutional rights and the adverse action taken against him.  Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003), quoting Rauser v. Horn, 241 F.3d 330, 333 (3d Cir.2001).

I first note that plaintiff's attempts to access the law library on specific instances are not constitutionally protected conduct that would give rise to a valid retaliation claim.  As noted above, inmates possess no abstract, freestanding constitutional right to a law library.  To the extent that plaintiff's retaliation claim is founded on denials of access to the law libraries at CFCF and PICC, I find his claim to be without merit because he fails to establish a genuine issue of material fact regarding the first step of the analysis.

To the extent that plaintiff's retaliation claim is founded upon his filing of grievances, I find that he fails to establish a genuine issue of material fact regarding the third step of the analysis.  The Court of Appeals applies a burden-shifting framework to determine whether a causal link exists between the exercise of an inmate's constitutional rights and the alleged adverse action taken against him.  See Rauser, 241 F.3d at 333, citing Mount Healthy Bd. of Ed. v. Doyle, 429 U.S. 274, 287 (1977).  "[O]nce a prisoner demonstrates that his exercise of a constitutional right was a substantial or motivating factor in the challenged decision, the prison officials may still prevail by proving that they would have made the same decision absent the

19

protected conduct for reasons reasonably related to a legitimate penological interest." Id. Yet I

need not engage in this burden-shifting analysis because plaintiff has failed to produce evidence

that filing grievances was the substantial or motivating factor behind defendants' alleged actions.

See Rauser, 241 F.3d at 334 (holding that plaintiff possesses "the initial burden of proving that

his constitutionally protected conduct was 'a substantial or motivating factor' in the decision to

discipline him").

      Though plaintiff accuses defendants of engaging in a series of retaliatory acts in response

to his filing of numerous grievances – e.g., including the transfer of plaintiff to PICC, the verbal

threats directed at plaintiff, the seizure of legal papers, the placement of plaintiff in

administrative segregation, the firing of plaintiff at the PICC law library, and the failure to hire

plaintiff at the CFCF law library – plaintiff's contention regarding causation – that defendants

"have systematically engaged in a course of adverse retaliatory conduct that was motivated, if not

whole, at least in substantial part, by [plaintiff's] insistence in exercising his rights" – is purely

speculative and has no support in the record.  For example, defendants Spellman and Knight –

who plaintiff alleges carried out the retaliatory act of firing him from employment at the PICC

law library based on his history of filing grievances – testified in their depositions that they had

no knowledge that plaintiff had filed prior grievances.  Just as there is no basis in the record to

infer that plaintiff was fired from the library because he filed numerous grievances, there is no

basis in the record to infer that plaintiff was treated in any allegedly unfavorable manner because

he filed numerous grievances.  The other alleged acts of retaliation are likewise unaccompanied

by evidence suggesting retaliation for the filing of prior grievances.  Though alleged acts such as

threats against plaintiff by certain defendants are perhaps abhorrent, they do not give rise to a

valid retaliation claim where plaintiff's allegations regarding a causal link are purely speculative.

For the reasons stated above I will grant defendants' motion for summary judgment on Count IV of plaintiff's amended complaint.

E.    Count V: Cruel and Unusual Punishment in Violation of the Eighth and Fourteenth Amendments

Count V of plaintiff's amended complaint alleges that defendants violated his rights under the Eighth and Fourteenth Amendments by subjecting him to inhumane and unsafe living conditions at CFCF and PICC which threaten his liberty and safety without due process of law. "The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."  Farmer v. Brennan, 511 U.S. 825, 832 (1994) (citations and quotation marks omitted).  "The Cruel and Unusual Punishments Clause, and indeed the entire Eighth Amendment, is made applicable to the states through the Fourteenth Amendment."  Hubbard v. Taylor, 399 F.3d 150, 164 n.21 (3d Cir. 2005), citing Robinson v. California, 370 U.S. 660 (1962).

"The Eighth Amendment was designed to protect those convicted of crimes and consequently the Clause applies only after the State has complied with constitutional guarantees traditionally associated with criminal prosecutions.  Thus, the Eighth Amendment's Cruel and Unusual Punishments Clause does not apply until after sentence and conviction."  Hubbard, 399 F.3d at 164, quoting Graham v. Connor, 490 U.S. 386, 392 n.6 (1989); Whitley v. Albers, 475 U.S. 312, 318 (1986) (citation and internal quotations omitted).

Count V of plaintiff's amended complaint is titled, "Cruel and Unusual Punishment in

Violation of the Eighth and Fourteenth Amendments Against All Defendants." At all times relevant to his cause of action plaintiff was incarcerated at CFCF or PICC while awaiting trial in the Philadelphia Court of Common Pleas. Though plaintiff states in his brief that his "allegations regarding the injuries he has suffered as a result of the dangerous overcrowding and understaffing at CFCF and PICC present a classic case for Eighth Amendment protection," as plaintiff had not been sentenced or convicted at the time his amended complaint was filed the Eighth Amendment's Cruel and Unusual Punishments Clause does not apply to the present action.

Plaintiff's brief does not suggest that his present claim regarding prison conditions arises under the Due Process Clause of the Fourteenth Amendment and at no point addresses law regarding conditions of confinement for pre-trial detainees. Nevertheless, reading plaintiff's amended complaint liberally, I will address to whether conditions of confinement alleged by plaintiff constituted a violation of the Due Process Clause of the Fourteenth Amendment.

When a case concerns "state pre-trial detainees, any applicable constraints must arise from the Due Process Clause of the Fourteenth Amendment." Hubbard, 399 F.3d at 158 n.13, citing Fuentes v. Wagner, 206 F.3d 335, 344 (3d Cir. 2000). The Supreme Court's due process analysis under the Fifth Amendment controls that inquiry. Id., citing Union County Jail Inmates v. DiBuono, 713 F.2d 984, 991-92 (3d Cir. 1983). In Bell v. Wolfish the United States Supreme Court held, "In evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate only the protection against deprivation of liberty without due process, we think that the proper inquiry is whether those conditions amount to punishment prior to an adjudication of guilt in accordance with law." 441 U.S. 520, 535 (1979).

In addressing whether conditions of confinement that constituted punishment in violation

22

of the Due Process Clause the Court of Appeals has applied the following two-step test: "first, whether any legitimate purposes are served by these conditions, and second, whether these conditions are rationally related to these purposes." DiBuono, 713 F.2d at 992, citing Bell, 441 U.S. at 542. The Court continued, "In assessing whether the conditions are reasonably related to the assigned purposes, we must further inquire as to whether these conditions 'cause [inmates] to endure [such] genuine privations and hardship over an extended period of time, that the adverse conditions become excessive in relation to the purposes assigned to them.'" Id., quoting Bell, 441 U.S. at 542. "In evaluating a pretrial detainee's claim of unconstitutional punishment, courts must examine the totality of the circumstances within the institution." Stevenson v. Carroll, 495 F.3d 62, 68 (3d Cir. 2007).

There is insufficient evidence in the record to support a due process claim here. Though plaintiff's amended complaint alleges that he "has been the victim of violence and threatened violence by other inmates," plaintiff has presented no evidence to support his bald allegation that these conditions were "directly caused by the . . . inhumane living conditions at CFCF and PICC." Plaintiff's amended complaint further alleges that "inmates in CFCF and PICC are frequently subjected to lockdown conditions where they are forced to remain in their cells for 22-23 hours per day and are denied access to fundamentals such as phone calls and showers." However, considering the totality of the circumstances within the institution and the context of lockdown – where there is a major disturbance in the facility – I conclude that these deprivations cannot satisfy the two-part test set forth in DiBuono. It is clear that the record in this case is materially different from that in Bowers v. City of Philadelphia, where this Court, considering allegations and extensive evidence of record that overcrowding led to a series of other conditions

23

including extended stays in holding cells without beds, showers, and hygiene materials along with neglect of medical issues and increasing sanitation problems, found that constitutional violations occurred.  2007 WL 219651, at *22 (E.D. Pa. Jan. 25, 2007).

For the reasons stated above I will grant defendants' motion for summary judgment on Count V of plaintiff's amended complaint.

III.     Defendants Giorla and King

Defendants argue that judgment should be granted in favor of defendants Giorla and King because there is no record evidence that either of these supervisory officials possessed actual knowledge or acquiesced in the alleged constitutional violations.  Because I will grant defendants' motion for summary judgment on other grounds, I need not reach this issue.

IV.     Qualified Immunity

Defendants insert in their motion for summary judgment an argument based on qualified immunity.  When a state official's actions give rise to a § 1983 claim, the privilege of qualified immunity, in certain circumstances, can serve as a shield from suit.  Wright v. City of Philadelphia, 409 F.3d 595, 599 (3d Cir. 2005), citing Hunter v. Bryant, 502 U.S. 224, 227 (1991).  Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation."  Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).  Since qualified immunity is "an immunity from suit, rather than a mere defense to liability, it is imperative to resolv[e] immunity questions at the earliest possible stage in litigation."  Saucier v. Katz, 533 U.S. 194, 200-01 (2001) (citations and emphasis omitted).

The threshold question of the qualified immunity analysis is: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the [state actor's] conduct

violated a constitutional right?"  <u>Id.</u> at 201.  If no constitutional violation is shown the inquiry

need not progress and the state actors are entitled to judgment; however, if the facts alleged

demonstrate a constitutional violation, the Court must proceed to ask whether the constitutional

right was clearly established at the time in light of the specific context of the case at bar.  <u>Id.</u>

This two-step inquiry reflects the rationale behind the doctrine of qualified immunity: "The

general rule of qualified immunity is intended to provide government officials with the ability

reasonably to anticipate when their conduct may give rise to liability for damages.  Where that

rule is applicable, officials can know that they will not be held personally liable as long as their

actions are reasonable in light of current American law."  <u>Anderson v. Creighton</u>, 483 U.S. 635,

646 (1987) (quotation and citation omitted).

  As the Court of Appeals has recognized, "There is some disagreement as to how <u>Saucier</u>

should be interpreted.  Specifically, the dispute is whether a court must determine the issue of

whether there has been a constitutional violation before reaching the qualified immunity

question, or whether that inquiry is the first part of a two-pronged test for qualified immunity."

<u>Wright</u>, 409 F.3d at 600 ("In some cases, we have interpreted <u>Saucier</u> to imply that the issue of

qualified immunity is only relevant after a court has concluded that a constitutional violation has

occurred.  In that view, if there is no constitutional violation, there is no reason to reach the

qualified immunity issue.  <u>See, e.g.</u>, <u>Carswell v. Borough of Homestead</u>, 381 F.3d 235, 237 (3d

Cir. 2004).  In other cases, we have interpreted <u>Saucier</u> to mean that a defendant is entitled to

qualified immunity unless a plaintiff can prove both that a constitutional right has been violated,

and then that the constitutional right violated was clearly established.  <u>See, e.g.</u>, <u>Bennett v.</u>

<u>Murphy</u>, 274 F.3d 133, 136-37 (3d Cir. 2002).  Under either interpretation, if no constitutional

violation is found, a court need not address whether a reasonable officer would have known he or she was violating a clearly established right.")  The Court has "recognize[d] that a conclusion that no constitutional violation took place would also negate an essential element of the § 1983 claim."  Id. at 601, citing Albright v. Oliver, 510 U.S. 266, 271 (1994) ("As a practical matter, the outcome will be the same whether we conclude that the officers are immune from suit or instead, that the plaintiff has no cause of action.").

Pursuant to the above analysis I find that there exist no genuine issues of material fact with respect to plaintiff's § 1983 claims and that defendants are entitled to summary judgment. Therefore I find it unnecessary to address the issue of qualified immunity and the conflicting interpretations of Saucier in this case.

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

RUSSELL TINSLEY            :         CIVIL ACTION
                           :         NO. 05-2777
         V.                :
                           :
LOUIS GIORLA, et al.       :


<u>ORDER</u>

AND NOW, this 1st day of April 2008, upon consideration of defendants' motion for

summary judgment, plaintiff's response, and defendants' reply, it is ORDERED that defendants'

motion for summary judgment is GRANTED and judgment is entered against plaintiff and in

favor of defendants with respect to all counts of plaintiff's amended complaint.



                           s/Thomas N. O'Neill, Jr.
                           THOMAS N. O'NEILL, JR., J.